In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-12-00585-CV

**WALLACE DEBES, Appellant**

**V.**

**CAHOOTS ENTERTAINMENT, INC., BRIAN LEE O'QUINN, DANA O'QUINN, AND JEFFREY O'QUINN, Appellees**

**On Appeal from the 136th District Court**
**Jefferson County, Texas**
**Trial Cause No. D-191,415**

## MEMORANDUM OPINION

Appellant Wallace Debes is the owner of a commercial property, which he leased to Cahoots Entertainment, Inc. ("Cahoots"). After fire damaged the property, Debes brought suit against Cahoots, Brian Lee O'Quinn, Jeffrey O'Quinn, and Danna O'Quinn (collectively, the "defendants") for breach of the lease agreement. Debes claimed that the defendants failed to satisfy their contractual obligation under the lease to maintain fire and extended coverage insurance on the leased premises for the benefit and protection of Debes. The trial

1

court granted summary judgment in favor of the defendants, and Debes appealed. We affirm.

## I.    Background

Debes alleged the following facts in his live petition.  Debes owns commercial property located at 315 North IH-10 in Beaumont, Texas.  In February 2004, Debes, as landlord, and Cahoots, as tenant, entered into a written lease agreement, pursuant to which Cahoots agreed to lease the property from Debes.[1] Brian O'Quinn, the president of Cahoots, and his father, Jeffrey O'Quinn, each executed a personal guaranty of the lease.  According to the terms of the lease, Cahoots was required to maintain fire and extended coverage insurance in a minimum amount of $500,000 on the leased premises.

Cahoots subsequently purchased a commercial property insurance policy from General Star Indemnity Company ("General Star") that insured the leased premises.  The policy identified "DANNA O'QUINN DBA: ALIBI'S" as the only

---

[1] The original term of the lease was for thirty-six months, commencing April 1, 2004.  The lease, therefore, expired by its own terms on April 1, 2007. The record does not indicate whether the parties entered into a written agreement to renew the lease.  Both sides, however, presume that the terms of the lease were in effect and governed the parties' relationship at the time of the fire on July 4, 2011. For purposes of this opinion, therefore, we also presume that the terms of the lease were in effect and governed the parties' relationship at the time of the fire on July 4, 2011.

named insured.[2]  On July 4, 2011, while the policy was in effect, a fire damaged the building on the leased premises and its contents. After the fire, Danna O'Quinn made a claim under the General Star policy and received proceeds for certain damage caused by the fire.  Debes also made a claim under the policy for damage caused by the fire, but General Star denied coverage of his claim.

Thereafter, Debes filed suit against the defendants for breach of contract, claiming that the lease required Cahoots to maintain fire and extended coverage insurance on the leased premises for the protection of Debes and that the defendants breached the lease by failing to maintain such insurance and by failing to pay the proceeds they received from General Star to Debes.  The defendants filed a combined traditional and no-evidence motion for summary judgment on Debes's breach of contract claim. In their traditional motion for summary judgment, the defendants argued that, as a matter of law, the lease did not require Cahoots to purchase insurance for the benefit or protection of Debes. In their no-evidence motion for summary judgment, the defendants argued that there was no evidence of a contractual requirement that obligated Cahoots to purchase insurance for the benefit or protection of Debes.  The trial court granted the defendants'

[2] Although a copy of the insurance policy is included in the record for this appeal, it was not part of the summary judgment evidence presented by the parties in the proceedings below.  Therefore, we do not rely on the policy, or any language contained therein, for the disposition of this appeal. We reference the policy here only to provide background information regarding the events leading up to the parties' dispute.

motion for summary judgment without specifying whether it granted the motion on traditional or no-evidence grounds. When the trial court does not specify the grounds upon which it ruled, we will uphold the summary judgment if it can be sustained under either traditional or no-evidence grounds. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). Debes timely filed a notice of appeal. We conclude that the trial court properly granted the defendants' traditional motion for summary judgment.

## II.    Standard of Review

We review a trial court's summary judgment ruling de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). To prevail on a traditional motion for summary judgment, the moving party must prove that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion[.]" Tex. R. Civ. P. 166a(c); *see also Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). A defendant who moves for summary judgment must either: (1) disprove at least one element of the plaintiff's theory of recovery, or (2) plead and conclusively prove each element of an affirmative defense. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). If the movant meets its burden, the burden then shifts to the non-movant to raise a genuine issue of material fact precluding summary judgment. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996). The evidence

4

raises a fact issue if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). To determine if the non-movant has raised a fact issue, evidence favorable to the non-movant is taken as true, all reasonable inferences are carried in the non-movant's favor, and any doubts must also be resolved in favor of the non-movant. *See City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

### III.   Analysis

In their traditional motion for summary judgment, the defendants argued that Debes could not maintain a breach of contract claim against them because the lease required Cahoots to maintain fire and extended coverage insurance on the leased premises only for its own benefit, and not for the benefit or protection of Debes. In support of this argument, the defendants attached a copy of the lease to their motion for summary judgment. Article X of the lease states, in relevant part:

### ARTICLE X
### INSURANCE; FIRE & CASUALTY DAMAGE

**Tenant** shall maintain fire and extended coverage insurance in a minimum amount of $500,000.00 on the **PREMISES** (the "Casualty Insurance") for it's [sic] own benefit, subject to the following provisions of this paragraph.

**Landlord** shall repair any damage or destruction to the **PREMISES** (but not to **Tenant's** property) caused by any peril covered by the Casualty Insurance, to the extent **Landlord** receives proceeds from the Casualty Insurance.

The defendants argue that the language of Article X, including, in particular, the phrase "for it's [sic] own benefit" in the first paragraph of Article X, unambiguously requires Cahoots to maintain fire and extended coverage insurance only for the benefit of Cahoots, and not for the benefit of Debes.

Debes, by contrast, argues that the lease requires Cahoots to maintain fire and extended coverage insurance, at least in part, for the protection of Debes. Specifically, Debes points to the second paragraph of Article X, which requires Debes to "repair any damage or destruction to the **PREMISES** (but not to **Tenant's** property) caused by any peril covered by the Casualty Insurance, to the extent **Landlord** receives proceeds from the Casualty Insurance." Debes argues that the language in the second paragraph of Article X unambiguously grants Debes a contractual right to receive proceeds from the fire and extended coverage insurance policy maintained by Cahoots to the extent Debes's property sustains damage as a result of a fire. Debes also argues that the second paragraph of Article X can be harmonized with the first paragraph of Article X by construing the phrase "for it's [sic] own benefit" in the first paragraph not to mean that Cahoots was required to maintain casualty insurance only for the benefit of Cahoots, as the defendants argue, but instead to mean simply that Cahoots retained the right to control the repairs made to the leased premises in the event of a fire to ensure that the leased premises would remain suitable for Cahoots's commercial purposes.

6

Debes argues that the trial court erred by failing to give effect to the language in the second paragraph of Article X when it granted summary judgment in favor of the defendants. Debes further argues that to the extent the language in the second paragraph of Article X cannot be harmonized with the language in the first paragraph, the lease is ambiguous, and the trial court's order granting summary judgment should be reversed because genuine issues of material fact exist with respect to the meaning of the lease.

Resolution of the parties' dispute requires interpretation of the lease. In construing a written contract, the primary concern of the court is to ascertain and give effect to the true intentions of the parties as expressed in the written instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To achieve this result, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "We presume that the parties to a contract intend every clause to have some effect." *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 500 (Tex. 2007). We give terms their "plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Similarly, we give the language of an agreement its "plain grammatical

7

meaning unless to do so would defeat the parties' intent." *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999). We will not give a single provision alone controlling effect; rather, we consider all the provisions with reference to the whole instrument. *J.M. Davidson*, 128 S.W.3d at 229.

If, after applying the pertinent rules of construction, the contract can be given a definite or certain legal meaning, the contract is unambiguous, and we construe it as a matter of law. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). A contract is not ambiguous "simply because the parties advance conflicting interpretations of the contract[.]" *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001). Rather, a contract is only ambiguous if, after applying the pertinent rules of contract construction, the contract is subject to two or more reasonable interpretations. *J.M. Davidson*, 128 S.W.3d at 229.

### A. The Lease

We begin our analysis by examining the language of the lease. The first paragraph of Article X states that "**Tenant** shall maintain fire and extended coverage insurance in a minimum amount of $500,000.00 on the **PREMISES** (the "Casualty Insurance") for it's [sic] own benefit . . . ." Central to the parties' dispute is the meaning of the phrase "for it's [sic] own benefit." In analyzing this phrase, we initially note that although the parties to the lease used the word "it's" in the phrase "for it's [sic] own benefit," it is evident from the word's placement

8

and context that the parties intended to use the word "its." As one commentator has noted, the words "it's" and "its" have different meanings, but are "often confounded." BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 486 (3rd ed. 2009). While the word "it's" is a contraction of the words "it is," the word "its" is the possessive form of the pronoun "it."[3] *Id.*; *see also* RANDOM HOUSE WEBSTER'S GRAMMAR, USAGE, AND PUNCTUATION 203 (2008). In their briefs, both Debes and the defendants construe the phrase "for it's [sic] own benefit" as though the phrase uses the word "its," rather than "it's." Because we conclude that this is the only construction of the phrase that makes sense, we also construe the phrase "for it's [sic] own benefit" as though it uses the word "its," rather than "it's."

Having determined that the parties to the lease intended to use the word "its," we turn to the meaning of the phrase "for it's [sic] own benefit," as it is used in the first paragraph of Article X. As noted above, "its" is the possessive form of the pronoun "it." A pronoun (including its possessive form) derives its meaning from its antecedent, which is the noun for which the pronoun substitutes. *See* H. RAMSEY FOWLER & JANE E. AARON, THE LITTLE, BROWN HANDBOOK 291 (5th ed. 1992). The antecedent to a pronoun is ordinarily the closest appropriate noun

---

[3] Where, as here, a possessive pronoun is used syntactically as an adjective, it is also sometimes referred to as a "possessive adjective." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 1816 (2002).

9

preceding the pronoun. *Verhoev v. Progressive Cnty. Mut. Ins. Co.*, 300 S.W.3d 803, 809 (Tex. App.—Fort Worth 2009, no pet.). Further, the antecedent should agree in number and gender with the pronoun. GARNER, GARNER'S MODERN AMERICAN USAGE at 541; *see also Davis v. Pletcher*, 727 S.W.2d 29, 33 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.). Applying these rules, we conclude that the only logical antecedent to the word "it's" (i.e., "its"), as used in the phrase "for it's [sic] own benefit," is the noun "Tenant," used earlier in the same sentence. The term "Tenant," in turn, is defined by the lease as Cahoots. The phrase "for it's [sic] own benefit" in the first paragraph of Article X, therefore, means "for the benefit of Cahoots."

By contrast, nothing in first paragraph of Article X or any other provision of the lease states that Cahoots is required to maintain fire and extended coverage insurance for the landlord's benefit or for the benefit of the tenant and landlord jointly. Clearly, the parties knew how to draft language identifying the party or parties for whose benefit the fire and extended coverage insurance would be maintained, as evidenced by the inclusion of the phrase "for it's [sic] own benefit" in the first paragraph of Article X. If the parties had intended to require Cahoots to maintain fire and extended coverage insurance for Debes's benefit and protection, as Debes contends, they could have included language to that effect in the lease. They did not. We are not free to rewrite the parties' agreement to insert provisions

10

that the parties could have included, but did not. *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996); *see also Fein v. R.P.H., Inc.*, 68 S.W.3d 260, 267 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) ("[C]ourts are not at liberty to redraft the terms of a contract while professing to construe it, so as to impose additional duties on one party."). We conclude, therefore, that the first paragraph of Article X unambiguously requires Cahoots to maintain fire and extended coverage insurance on the leased property only for the benefit of Cahoots, and not for the benefit of Debes.

In adopting this construction of the lease, we necessarily reject Debes's argument that the phrase "for it's [sic] own benefit" should be interpreted to mean only that Cahoots had a right to control repairs made to the leased premises. Nothing in the first paragraph of Article X, or any other provision of the lease, suggests that the parties included the phrase "for it's [sic] own benefit" merely to identify which party would have control over repairs to the building in the event of a fire. Instead, when the words within the phrase are given their plain, ordinary, and generally accepted meaning, the plain purpose of the phrase is to identify the party for whose benefit and protection the insurance would be maintained—in other words, to identify the party whose interests would be protected by the policy and the intended recipient of any proceeds thereunder.

11

Further, contrary to Debes's argument, we find that the second paragraph of Article X, either when read alone or with the other provisions of the lease, does not grant a contractual right to Debes to receive proceeds from the casualty insurance policy maintained by Cahoots. The second paragraph of Article X states that "Landlord shall repair any damage or destruction to the **PREMISES** (but not to **Tenant's** property) caused by any peril covered by the Casualty Insurance, to the extent **Landlord** receives proceeds from the Casualty Insurance." Giving these words their plain, ordinary, and generally accepted meaning, it is clear that the second paragraph operates only to impose a duty on Debes to make certain repairs "to the extent" he receives proceeds from the fire and extended coverage insurance policy maintained by Cahoots. Significantly, nothing in the second paragraph of Article X or any other provision of the lease grants to or reserves for Debes a contractual right to receive any proceeds from the casualty insurance policy maintained by Cahoots or requires Cahoots to pay any proceeds from that policy to Debes. Likewise, nothing in Article X or any other provision of the lease requires Debes to be named as an additional insured or loss payee on the fire and extended casualty insurance maintained by Cahoots. In short, nothing in the lease entitles Debes to receive any portion of the proceeds paid under the casualty insurance

12

policy maintained by Cahoots.  Instead, the lease states only that Debes has a duty to repair "to the extent" he does receive such proceeds.[4]

Reviewing the lease in its entirety, we agree with the defendants that the lease unambiguously requires Cahoots to maintain fire and extended coverage insurance only for the benefit of Cahoots, and not for the benefit or protection of Debes. We further conclude that the unambiguous terms of the lease do not grant Debes a contractual right to receive proceeds from the fire and extended coverage insurance maintained by Cahoots.

---

[4] Our conclusion that the lease requires Cahoots to maintain fire and extended coverage insurance only for its own benefit does not mean that Debes could never receive proceeds from such insurance.  For example, Debes could potentially receive proceeds from the fire and extended coverage policy maintained by Cahoots if Cahoots made a claim under the policy for damage to covered property owned by Debes resulting from a covered loss, and Cahoots, either voluntarily or by separate agreement, provided Debes with all or a portion of the insurance proceeds to trigger Debes's duty to repair under the lease.  Alternatively, if the policy so provided, Cahoots could make a claim under the policy for damage to covered property owned by Debes resulting from a covered loss, and the insurance carrier could choose, at its discretion, to adjust such loss with Debes and pay proceeds directly to Debes, as the owner of the property, even though Debes was not expressly named as an insured or loss payee. *See Ostrovitz & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 389-90 (Tex. App.—Dallas 2012, no pet.) (noting that commercial property insurance policy issued to the tenant of leased property contained language giving the insurer the right, at its discretion, to adjust losses and pay the owner of leased property directly, even though the property owner was not a named or additional insured under the policy and even though the policy was not made for the benefit of the property owner).

## B.     Extrinsic Evidence

Despite the unambiguous language of the lease, Debes urges us to consider certain extrinsic evidence to interpret the meaning of the first and second paragraphs of Article X. Specifically, Debes argues that we should interpret these lease provisions in light of certain statements allegedly made by Jeffrey O'Quinn to Debes during a meeting to negotiate the terms of the lease. Debes argues that these statements evidence an intention by the parties to require Cahoots to purchase fire and extended coverage insurance coverage for the benefit of both Cahoots *and* Debes. The defendants, on the other hand, argue that the alleged statements constitute parol evidence and may not be used to interpret the unambiguous terms of the lease or to create an ambiguity in the lease where none would otherwise exist.

Before we address whether the parol evidence rule precludes our consideration of the alleged statements made by Jeffrey O'Quinn, we first consider whether Debes presented competent summary judgment evidence of such statements. In this respect, the record reflects that the only "evidence" that Debes presented of the alleged statements consisted of the following allegations in his response to the defendants' motion for summary judgment:

> Debes and Jeffrey O'Quinn had been business partners prior to the execution of the subject Lease. Both Debes and Jeffrey O'Quinn met at the office of Kenneth D. Furlow to discuss the terms of the Lease. Jeffrey O'Quinn wanted to pay for the fire and other casualty

14

insurance and agreed to carry at least $500,000.00 for the protection of Landlord and an additional amount to protect Tenant. Jeffrey O'Quinn wanted Cahoot[s] to be able to dictate the repairs to be done out of the payment of insurance, so the language was for that purpose, however, Debes is definitely a third party beneficiary under the policy.

At the end of his summary judgment response, Debes included a "Sworn Affidavit," in which Debes stated, under oath: "I am duly authorized to sign this Affidavit and have personal knowledge of the correctness and truth of the allegations in this Motion." Debes did not attach any other affidavits or evidence to his response.

It is well-established that "[a] party may not support its response to a motion for summary judgment with a document in the form of an affidavit in which the party attempts to verify the truth and correctness of all 'allegations and facts' in the response." *Olsen v. Comm'n for Lawyer Discipline*, 347 S.W.3d 876, 886 (Tex. App.—Dallas 2011, pet. denied); *see also Livingston Ford Mercury, Inc. v. Haley*, 997 S.W.2d 425, 431 (Tex. App.—Beaumont 1999, no pet.); *Keenan v. Gibraltar Sav. Ass'n*, 754 S.W.2d 392, 394 (Tex. App.—Houston [14th Dist.] 1988, no writ). "Such a document amounts to nothing more than a verified responsive pleading, which is not competent summary judgment evidence." *Olsen*, 347 S.W.3d at 886; *see also Quanaim v. Frasco Rest. & Catering*, 17 S.W.3d 30, 42 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("[N]either the motion for summary judgment, nor the response, even if sworn, is ever proper summary judgment

15

proof."). "To effectively oppose a motion for summary judgment, the affidavit must *itself* set forth facts and show that the affiant is competent to testify to those facts." *Olsen*, 347 S.W.3d at 886 (internal quotes omitted); *see also Webster v. Allstate Ins. Co.*, 833 S.W.2d 747, 749 (Tex. App.—Houston [1st Dist.] 1992, no writ). We conclude that the allegations in Debes's summary judgment response, even though sworn, do not constitute competent summary judgment evidence and, thus, may not be considered in our analysis regarding the proper interpretation of the lease. As such, we need not decide whether the parol evidence rule applies to bar our consideration of such statements.

We conclude that the trial court properly granted the defendants' traditional motion for summary judgment on Debes's breach of contract claims. Accordingly, we need not address the defendants' no-evidence grounds for summary judgment. *See* Tex. R. App. P. 47.1 (instructing that an opinion need only address issues necessary to final disposition of the appeal). We affirm the order of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on January 10, 2014
Opinion Delivered July 10, 2014

Before McKeithen, C.J., Kreger and Horton, JJ.